** TOTAL PAGE.05 **

1   JESSE W. MARKHAM (STATE BAR NO. 87788)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
2   Old Federal Reserve Bank Building
    400 Sansome Street
3   San Francisco, CA 94111-3143
    Telephone:   415-392-1122
4   Facsimile:   415-773-5759

5   RALPH P. GUENTHER, ESQ. [124245]
    THOMAS R. DUFFY, ESQ. [65679]
6   DUFFY & GUENTHER
    5 Harris Court, Bldg N, Suite 3
7   Monterey, CA 93940
    Telephone:   831-649-5100
8   Facsimile:   831-649-5102

9   Attorneys for Plaintiff
    GIACALONE ELECTRICAL SERVICES, INC., a California
10  Corporation

**ORIGINAL**
**FILED**

SEP 0 9 2003

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

11              UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA  E-FILING

13                 SAN JOSE DIVISION

14

15  GIACALONE ELECTRICAL SERVICES,          C03    04100 JW
16  INC., a California corporation,                           RS

17              Plaintiff,            COMPLAINT FOR DAMAGES AND
                                      INJUNCTIVE RELIEF FOR
18       v.                           VIOLATIONS OF THE SHERMAN
                                      ACT, THE CLAYTON ACT,
19  WESCO DISTRIBUTION, INC., a Delaware  BUSINESS & PROFESSIONS CODE
    corporation, HERNING ENTERPRISES,   SECTION 17200, BREACH OF
20  INC., a California corporation,       CONTRACT, TORTIOUS
                                      INTERFERENCE WITH
21              Defendant.            CONTRACTUAL RELATIONS;
                                      TORTIOUS INTERFERENCE WITH
22                                    PROSPECTIVE ECONOMIC
                                      ADVANTAGE; DEMAND FOR JURY
23                                    TRIAL

                                      **BY FAX**
24

25       Plaintiff Giacalone Electrical Services, Inc. ("GESI") complains of Defendants Wesco

26  Distribution, Inc. ("Wesco") and Herning Enterprises, Inc. ("Herning") as follows:

27

28

DOCSSF1:701829.1

1

Filed By
One Legal

## NATURE OF THIS ACTION

1.     This complaint seeks injunctive relief and damages arising out of defendants' unlawful acquisition and maintenance of a monopoly in the relevant market for pad mounted transformers, and defendants' blatant and ongoing misuse of monopoly power towards plaintiff GESI, coupled with a pattern and practice of fraudulent billing practices, breaches of contract, and tortious misconduct.

2.     Defendant Wesco, a large electrical supplier, has a written contract to supply plaintiff GESI, an electrical contractor, with all pad mounted transformers which GESI requires at pricing and on terms which are favorable to GESI.  Wesco has acquired all the competitors in the marketplace who manufacture such transformers, and has thereby achieved a complete monopoly on all sources of supply for electrical pad mounted transformers certified for use in the service territory of the Pacific Gas & Electric Company ("PG&E") (essentially all of Northern California).  Notwithstanding Wesco's written contractual obligations to GESI, as soon as Wesco completed acquisition of its major competitor and secured its monopoly on transformers, Wesco, using its monopoly power, began an intentional course of conduct designed to terminate GESI's favorable contract, and increase the prices on transformers to GESI and others similarly situated. Wesco's intentions in this regard are succinctly expressed in Wesco's 2003 business plan, and are unequivocal.  The business plan is explicit: "our strategy is to do whatever is necessary to maintain our market share."  Elements of this strategy include a predatory scheme to exclude new competing suppliers with the objective being "to inch prices back to levels we previously enjoyed."  Because GESI is the largest customer in the relevant market, and because Wesco believes that GESI is supporting the effort of a new distributor in the non-pad mounted transformer markets, WESCO has targeted GESI as part of this scheme.  Thus, an articulated part of the business strategy set forth in the business plan is to:

"• Terminate the current Giacalone [GESI] agreement at the earliest possible date.  The sooner this happens, the better chance we have to implement a new agreement that limits their options. . . .

DOCSSF1:701629.1

- 2 -

1    • Gradually increase margins on products that we maintain exclusivity [monopoly]."

2    (Wesco 2003 Business Plan, attached as Exhibit C hereto)

3                                    **PARTIES**

4    3.    GESI is a California corporation headquartered in Gilroy, California.

5    4.    Wesco is a Delaware corporation doing business in California.  Wesco was

6    formerly part of Westinghouse, and boasts of sales in excess of $3.9 billion per year.

7    5.    Herning is a California corporation doing business in California, which, since

8    February 2001, has been wholly owned by Wesco.

9                          **JURISDICTION AND VENUE**

10   6.    GESI brings this action for treble damages, attorneys' fees, and permanent

11   injunctive relief against defendants Wesco and Herning pursuant to Section 2 of the Sherman Act

12   (15 U.S.C. § 2), Section 7 of the Clayton Act (15 U.S.C. § 7), and California Business &

13   Professions Code § 17200.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

14   1331, 1337 and 1367.

15   7.    Venue is proper in this judicial district because defendants transact business within

16   this district, and the unlawful activities occurring or being threatened have been or will be carried

17   on in part within this district.

18                              **RELEVANT MARKETS**

19   8.    For purposes of GESI's antitrust claims, the relevant product markets include  the

20   market for sale of PG&E approved pad mounted transformers (hereinafter referred to generally as

21   "transformers").

22   9.    The relevant geographic market for assessing competition in all relevant product or

23   service markets is the Service Territory allocated to PG&E by the California Public Utilities

24   Commissions pursuant to state law (the "PG&E Service Territory").  The PG&E Service

25   Territory comprises a substantial part of northern California.

26

27

28

DOCSSF1:701629.1                          - 3 -

1

## INTERSTATE COMMERCE

2   10. The conduct of defendants Wesco and Herning complained of herein has taken

3 place in and affected interstate trade and commerce of the United States in that the sales of

4 electrical supplies are transacted across state lines.

5   11. Defendants' conduct complained of herein has directly, substantially and

6 foreseeably affected interstate trade and commerce in that defendants have obstructed free and

7 open competition in the markets for the sale of electrical supplies in the PG&E Service Territory.

8

## BACKGROUND

9   12. This action concerns the supply of electrical equipment in Northern California.

10 GESI is an electrical contracting company which has been in business since 1987.  A substantial

11 portion of GESI's business consists of supplying and installing electrical equipment for

12 residential, industrial and commercial uses, government facilities, streets and highways, and

13 similar uses, which jobs often require the installation of pad mounted electrical transformers.

14   13. PG&E is the electrical power distribution utility for the PG&E Service Territory,

15 which is where GESI's projects occur.  Pursuant to state regulation and PG&E specifications, no

16 transformers may be installed in the PG&E Territory that have not been approved by PG&E for

17 connection with its electric power distribution system.  PG&E has approved only two

18 manufacturers' brands of pad mounted transformers - ABB and Howard.

19   14. The ability to obtain PG&E approved transformers is critical to GESI's business.

20 If GESI is unable to obtain PG&E approved transformers in a timely manner, GESI will be

21 unable to complete its current projects, and unable to compete for future projects which require

22 the approved transformers.

23   15. As of September 12, 2000, the date the KVA Agreement was signed (*see below*),

24 there were only two suppliers for the approved PG&E transformers in the PG&E Service

25 Territory – defendant Herning and KVA Southwest Supply, Inc. ("KVA").  At or around

26 September 2000, KVA was in the process of entering the relevant market which previously had

27 been monopolized unlawfully by Herning, as alleged below.  Herning, Wesco and KVA

28

DOCSSF1:701629.1

- 4 -

1  subsequently destroyed competition by eliminating KVA as a separate enterprise and

2  consolidating Herning and KVA.

3           **Herning's Unlawful Monopolization and Exclusive Dealing Arrangement**

4           16.    At all relevant times prior to approximately September 2000, and continuing to the

5  present, Herning has maintained exclusive distribution agreements with both ABB and Howard,

6  the only two manufacturers for PG&E approved pad mounted transformers.

7           17.    Transformers for PG&E's Service Territory are available to contractors and other

8  customers only from Herning. All transformers acquired by GESI and other contractors operating

9  in the PG&E Service Territory are available only from Herning because of its exclusive dealing

10  arrangement with the two certified manufacturers.

11          18.    On information and belief, Herning earned at all relevant times a profit margin of

12  approximately 30% to 35% on transformers, while the norm in the industry is 8% to 12%.

13          19.    Herning's exclusive dealing arrangements with ABB and Howard, taken together,

14  have foreclosed substantially all competition in the relevant market for transformers available and

15  certified for use in PG&E's Service Territory.

16          **GESI Enters Into Long-Term Contract For Supply of Transformers**

17          20.    Sometime prior to September 12, 2000, KVA arranged to obtain a supply of ABB

18  and Howard transformers for resale into the PG&E Service Territory.

19          21.    In September 2000, GESI and KVA entered into a Material Management Alliance

20  Agreement (the "KVA Agreement" a copy of which is attached hereto and made a part hereof as

21  Exhibit A). The KVA Agreement provides for a five-year renewable term. The KVA Agreement

22  remains in full force and effect, and by its terms does not expire until at least September 11, 2005,

23  subject to two additional three-year renewal options.  As part of the alliance set forth in the

24  contract, KVA has the obligation to supply GESI with its electrical materials and supply

25  requirements, including transformers, at a 15% discount below prices charged by KVA to other

26  comparable contractors in PG&E's Service Territory.

27

28

1    **Wesco Obtains Monopoly in Transformer Market**

2        22.    Defendant Wesco acquired KVA in October 2000, shortly after the KVA

3    Agreement was executed.

4        23.    Shortly after the Wesco-KVA acquisition was completed, in February 2001,

5    Wesco acquired defendant Herning.

6        24.    When the Herning acquisition was completed, Wesco had acquired a complete

7    monopoly in the PG&E Service Territory on all sources of supply for transformers.

8    **Wesco Breaches KVA Agreement with GESI, and Uses Monopoly Power to Unilaterally**
9    **Force Change in KVA Agreement**

10       25.    Shortly after Wesco acquired its monopoly on all approved transformers in the

11   PG&E service area, Wesco informed GESI that it intended to change the KVA Agreement, and

12   specifically intended to reduce favorable 15% discount to GESI, while requiring GESI to

13   purchase all of its transformers from defendant Herning, at a higher price than charged for the

14   same transformers by KVA.

15       26.    Even though the term of the KVA Agreement does not expire until September,

16   2005, Wesco nevertheless demanded that GESI sign an amendment to the KVA Agreement

17   which would reduce the price discount from 15% to 8% ("the Proposed Amendment").  A true

18   and correct copy of the Proposed Amendment is attached hereto as Exhibit B.

19       27.    Wesco provided the Proposed Amendment on a "take it or leave it" basis.

20       28.    GESI refused to sign the Proposed Amendment, but Wesco used its monopoly

21   power to unilaterally implement the its proposed terms and reduced GESI's discount rate to 8%.

22       29.    Wesco then took the following actions regarding GESI:

23             a.    Wesco began delivering GESI orders late;

24             b.    Wesco failed to provide adequate shipping/delivery of GESI orders;

25             c.    Wesco refused to provide the 15% discount required by the KVA

26   Agreement, and unilaterally reduced the discount to 8%;

27

28

DOCSSF1:701629.1                              - 6 -

d.      Wesco refused to provide any discounts when invoiced, but instead stated that it would only provide a quarterly rebate of discounts to GESI;

e.      Wesco increased the pricing on transformers by approximately 15-20%;

f.      Wesco began requiring pre-payment in order to ship transformers to GESI, notwithstanding Wesco's contractual obligation to provide 60 day dating on invoices in the KVA Agreement.

30.      Wesco then began a repeated course of conduct of improper, illegal and fraudulent billing practices to GESI, which consisted of, by way of example:

g.      billing GESI for material and equipment never delivered to GESI;

h.      billing GESI for materials and equipment not ordered by GESI;

i.      double billing GESI for materials and equipment delivered;

j.      failing to credit GESI for materials and equipment returned, or billing GESI for orders which were cancelled and never fulfilled by WESCO;

k.      refusing to provide conditional lien waivers to GESI's customers unless paid in full, even though the billings were in error;

l.      falsifying and forging purported proofs of delivery in order to exact payments from GESI that Wesco knew were not due (including in one instance whiting out the original quantity of materials supplied and increasing the amount to one that exceeded by nearly 100% the entire volume of the job); and

m.      refusing to pay GESI any discounts whatsoever from April 2002-December 2002.

31.      GESI repeatedly notified Wesco of the incorrect billings described above, but Wesco continued to generate incorrect, improper and inaccurate billings to GESI, and to demand payment therefore.

32.      Ultimately, in September, 2002, GESI notified Wesco that it had identified and segregated bills with apparent errors in them, for the period from September, 2000 through September, 2002, and provided to Wesco a comprehensive list of each bill with the apparent error, which totaled $994,225.

33.     In addition, GESI indicated that it had backcharged Wesco for defective items delivered to various jobs, which totaled $64,234.93.

34.     At the same time as GESI informed Wesco that it was segregating the billings with apparent errors, GESI also informed Wesco that it would continue to make, and continues today to make, payment on all current billings which are not disputed.

35.     Wesco's billings were so full of errors that GESI indicated that it wanted a "Big Six" accounting firm to audit each job file in dispute.  Wesco initially agreed to the audit but then refused to pay the fees for the audit.  Ultimately, GESI's CFO performed a painstaking audit of each disputed job file, matching signed purchase orders, proofs of delivery (PODs) and bills rendered by Wesco.

36.     In April, 2003, the audit on the first 17 job files was completed and transmitted to Wesco.  The audit demonstrated that there were pervasive overbillings by Wesco, and that GESI was entitled to a credit of $295,587.  With negligible exceptions, Wesco agreed with the audit results as to those job files, and also agreed to the backcharges of $64,234.93, for a total credit of $359,821.29.  Wesco promised GESI in writing that credits would be issued by Wesco as to each of the audited job files.

37.     Then, notwithstanding Wesco's promise to credit GESI for the overbillings, Wesco informed GESI that Wesco would not issue any of the agreed upon credits for the audited job files until the audit results on all job files had been received.

38.     In June, 2003, before the audit on the balance of the job files was completed, notwithstanding Wesco's earlier agreement with the audit results on the first 17 jobs showing that GESI was entitled to credits totaling $359,821.29, Wesco demanded payment for the entire amount of all disputed bills without any of the agreed upon credits or backcharges, and informed GESI that GESI had to start making payments of $100,000 per month on these bills.  As well, Wesco placed GESI on "credit hold" and began requiring COD treatment for all future purchases, with the implicit threat of stopping shipment of the transformers on which it has a monopoly.  At the same time, Wesco threatened to report to the credit reporting agencies that its relationship with GESI was "unsatisfactory."

39.     Accordingly, in June, 2003, as its business survival was at stake, GESI paid Wesco under protest $100,000, and began paying for its shipments on a C.O.D. basis.

40.     In July 2003, GESI paid Wesco an additional $100,000 under protest.

41.     Notwithstanding the audit results on the first 17 job files which showed that the errors in Wesco's billings were pervasive, on July 25, 2003, Wesco informed GESI in writing that it was not prepared to make any corrections or adjustments to its billings, that the entire $1,043,216 of the disputed billings was due, and that Wesco was not prepared to engage in any discussion regarding the propriety of Wesco's billings. Wesco stated: "We do not believe that continued engagement in the process is to our mutual benefit."

42.     GESI has completed its audit of the Wesco billings, and has determined that, after all invoices, charges and credits have been considered (without taking into account the unpaid price discounts required under the KVA Agreement), GESI has overpaid Wesco the sum of $221,917.01 (not including the discount), and is presently due payment in such amount or more.

43.     In 2002, a competitor of Wesco was formed, Sunset Electrical Supply, Inc., which competes with Wesco in several lines of equipment, but not in the transformers on which Wesco has a monopoly. GESI has done and is doing business with Sunset with respect to non-monopoly electrical supplies.

44.     Wesco's motives for its actions toward GESI become clear after reviewing Wesco's 2003 business plan. The business plan discusses the competitive threat which Sunset poses to Wesco, and proposes that Wesco:

> "• **Terminate the current Giacalone [GESI] agreement at the earliest possible date. The sooner this happens, the better chance we have to implement a new agreement that limits their options.**
>
> • **Gradually increase margins on products that we maintain exclusivity [monopoly]."**

A true and correct copy of the salient portions of Wesco's business plan is attached hereto as Exhibit C.

## FIRST CLAIM FOR RELIEF
### (Monopolization in Violation of Section 2 of the Sherman Act)

45. Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-44.

46. For purposes of this claim the relevant product market is the market for sale of PG&E approved pad mounted transformers, and the relevant geographic market is the PG&E Service Territory.

47. At all relevant times, defendants have maintained a 100% share of sales in the relevant market and have had monopoly power in that market.

48. Defendants' monopoly position has been acquired and maintained through exclusionary conduct as opposed to a superior product, business acumen, or historic accident.

49. Defendants purchase for resale, market and resell the relevant products in interstate commerce, and have engaged in the exclusionary  and predatory conduct described herein through interstate channels.

50. If not enjoined, defendants' monopolization will continue, with the result that GESI will be frozen out of the market for electrical contracting projects, and/or will be forced to do business with defendants as monopolists on terms that will exclude new entry into the relevant market, and consumers will continue to pay supracompetitive prices for installations using the relevant products.

51. As a direct and proximate result of defendants' conduct, GESI has been injured in its business and property in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Illegal Merger under Section 7 of the Clayton Act )

52. Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-50.

53. For purposes of this claim the relevant lines of commerce in which to assess the competitive effects of the acquisition are the markets for sale of PG&E approved pad mounted

1    transformers, and the relevant geographic market in which to assess the competitive effects of the

2    acquisition is the PG&E Service Territory.

3        54.    The relevant markets are, and at all relevant times have been, highly concentrated,

4    with only one distributor supplying transformers to electrical contractors in the marketplace.

5    Furthermore, there are only two manufacturers supplying transformers in the relevant market,

6    each of which deals exclusively with Wesco/Herning as their only distributor.  Regulatory entry

7    barriers have prevented, and are likely to continue to prevent, new entry by competing

8    manufacturers into the relevant market.

9        55.    Prior to the acquisition, KVA managed to enter the market as a competitor to

10   Herning, and introduced price and other competition into the relevant markets.

11       56.    On or around October 2000, defendant Wesco acquired KVA.

12       57.    On or around February 2001, defendant Wesco acquired defendant Herning.

13       58.    Wesco's acquisition of Herning, at a point in time when Wesco had already

14   acquired KVA, constituted an illegal merger or acquisition under Section 7 of the Clayton Act, as

15   it effected a monopoly in the relevant market.  Said acquisition may substantially lessen

16   competition in that it eliminates actual, direct and substantial competition between KVA and

17   Herning; it removes KVA as the low cost supplier to the market; it increases the level of

18   concentration in the relevant market; it has led to and will continue to lead to price increases in

19   the relevant market; it may increase entry barriers in the relevant market by preventing customers

20   from purchasing transformers other than under restrictive terms that will prevent dealing with

21   new entrants and thereby prevent new entrants from reaching viable scale to compete; it has given

22   Wesco market power in the relevant markets.

23       59.    There are regulatory barriers preventing any other manufacturer from selling

24   relevant products in the relevant geographic market.  Wesco's exclusive dealing agreements

25   (through its acquired subsidiary Herning) with the only manufacturers permitted to sell in the

26   relevant market precludes all competition in the relevant market.

27       60.    The effect of the acquisition may be substantially to lessen competition or tend to

28   create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### THIRD CLAIM FOR RELIEF
### (Exclusive Dealing Under Section 3 of the Clayton Act)

61.     Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-59.

62.     For purposes of this claim the relevant product market is the market for sale of PG&E approved pad mounted transformers, and the relevant geographic market is the PG&E Service Territory.

63.     At all relevant times, defendant Herning has maintained exclusive distributorship agreements with each of ABB and Howard for the purchase and resale of pad mounted transformers in the PG&E Service Territory.  Pursuant to Wesco's acquisition of Herning, Wesco has benefited from Herning's exclusive and unlawful arrangements.

64.     Herning is engaged in interstate commerce, and Herning's exclusive distributorship agreements with each of ABB and Howard have been in the course of interstate commerce.

65.     Herning's exclusive distributorship agreements with ABB and Howard have been for the sale of goods, wares, merchandise, machinery, supplies or other commodities for use consumption or resale within the United States.

66.     The effect of each of Herning's exclusive distributorship agreements with ABB and Howard, and the effect of both of them in the aggregate, may be substantially to lessen competition or tend to create a monopoly in the relevant markets.

67.     If not enjoined, defendants' unlawful exclusive dealing arrangements will continue, with the result that GESI will be frozen out of the market for electrical contracting projects, and/or will be forced to do business with defendants as monopolists on terms that will exclude new entry into the relevant market, and consumers will continue to pay supracompetitive prices for installations using the relevant products.

68.     As a direct and proximate result of defendants' conduct, GESI has been injured in its business and property in an amount to be proven at trial.

DOCSSF1:701629.1

- 12 -

## FOURTH CLAIM FOR RELIEF
### (Breach of California Business & Professions Code Section 17200)

69.     Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-68.

70.     Defendants, and each of them, have engaged in business acts and practices that are unlawful, unfair and fraudulent, including, without limitation: fraudulently billing GESI, forging and misrepresenting as genuine proofs of delivery, using defendants' monopoly of the transformer market to force GESI to pay for defendants' fraudulent or inaccurate bills on threat of cutting GESI off from the supply of transformers needed to conduct GESI's business, using defendants' monopoly power to unilaterally declare changes in the contractual relationship with GESI, and overcharging GESI under prices and on terms that resulted from defendants' unlawful monopolization of the relevant market.

71.     GESI is entitled to preliminary and permanent injunctive relief sufficient to restrain Wesco from continuing or repeating such acts in the future, and an order restoring to GESI of any profits illegally obtained thereby.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract)

72.     Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-71.

73.     Wesco's actions alleged herein constitute multiple breaches of the KVA Agreement.

74.     The KVA Agreement provides for the award of attorneys' fees and costs in the event of litigation arising out of the agreement.

75.     GESI is entitled to an award of damages and attorneys' fees and costs for GESI's breach of contract.

DOCSSF1:701629.1

- 13 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SIXTH CLAIM FOR RELIEF
### (Fraud)

76.     Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-75.

77.     When Wesco billed GESI, it implicitly or explicitly represented that such invoices were valid and represented amounts appropriately billed to GESI under the terms of the KVA Agreement.

78.     These representations were false.  In fact, Wesco knew, or in the exercise of reasonable diligence, should have known, that the KVA invoices presented to GESI were materially inaccurate and contained multiple errors.  Such errors and deliberate misrepresentations included, without limitation:

    a.      Billing twice for the same material;

    b.      Billing for material never delivered to GESI;

    c.      Billing without purchase orders from GESI; and

    d.      Billing without appropriately crediting GESI with the 15% discount required by the KVA Agreement.

    e.      Forging proofs of delivery and presenting them to GESI as valid in order to deceive GESI into making payments that were not due.

79.     Wesco's actions alleged herein were intentional, willful, malicious and oppressive, or done with reckless and conscious disregard for the rights of GESI.

80.     GESI is entitled to an award of all damages caused by Wesco's fraud, costs of suit, and an award of punitive damages in an amount sufficient to deter others similarly situated.

## SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Contractual Relations)

81.     Plaintiff realleges and incorporates as though fully set forth herein the allegations contained in Paragraphs 1-80.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    82.    Plaintiff GESI has contractual relationships with its customers, pursuant to which

2    plaintiff is retained and paid to perform certain installations of electric power cable, transformers

3    and related equipment and hardware.

4    83.    Defendants know of GESI's contractual relationships with its customers.

5    84.    Defendant Herning has falsely informed GESI's customers that GESI was

6    charging them too much for transformers, and that GESI was on "credit hold" and was not paying

7    its bills, when, in fact Wesco was fraudulently billing GESI.

8    85.    Defendant Herning's statements were intended to injure, destroy or harm GESI's

9    relationships with its existing customers.

10    86.    Defendant Herning's said actions were undertaken as the agent of Defendant

11    Wesco.

12    87.    Defendants' aforesaid misconduct has interfered with GESI's contractual relations

13    with its customers.

14    88.    Defendants' actions alleged herein were intentional, willful, malicious and

15    oppressive, or done with reckless and conscious disregard for the rights of GESI.

16    89.    GESI is entitled to an award of all damages caused by Wesco's intentional

17    interference, costs of suit, and an award of punitive damages, in amounts to be proven at trial.

18    **EIGHTH CLAIM FOR RELIEF**
19    **(Intentional Interference with Prospective Economic Advantage)**

20    90.    Plaintiff realleges and incorporates as though fully set forth herein the allegations

21    contained in Paragraphs 1-89.

22    91.    GESI has economic relationships with third parties, including past, current and

23    prospective customers, with the probability of future economic benefit to GESI.

24    92.    Defendants know of GESI's economic relationships with its past, current and

25    prospective customers.

26

27

28

1   93.   Defendant Herning's actions in falsely informing GESI's customers that GESI was

2   on "credit hold" and was not paying its bills, when, in fact Wesco was fraudulently billing GESI,

3   were intended to injure, destroy or harm GESI's economic relationships.

4   94.   Defendant Herning's said actions were undertaken as the agent of Defendant

5   Wesco.

6   95.   Defendants' aforesaid misconduct has interfered with GESI's economic

7   relationships.

8   96.   GESI is entitled to an award of all damages caused by defendants' intentional

9   interference with GESI's prospective economic advantage, costs of suit, and an award of punitive

10   damages in amounts to be proven at trial.

11   **PRAYER**

**WHEREFORE, GESI demands judgment against Wesco and Herning granting:**

12   1.   Monetary damages sustained as a result of injury due to defendants' violations of

13   the Sherman Act (15 U.S.C. §2), and of Sections 3 and 7 of the Clayton Act (15 U.S.C. §§ 14 and

14   18), in amounts to be ascertained at trial, such amounts to be trebled pursuant to 15 U.S.C. § 15;2

15   2.   A permanent injunction to the degree the Court may deem appropriate, requiring

16   divestiture of defendant Wesco's interest in defendant Herning;

17   3.   An order declaring each and every exclusive dealing agreement between either or

18   both of Wesco and Herning, and ABB, and between either or both of Wesco and Herning, and

19   Howard, to be void and unlawful, and ordering such additional appropriate declaratory or

20   injunctive relief as the court deems appropriate to restore competition to the relevant market;

21   4.   A permanent injunction pursuant to California Business & Professions Code §

22   17203 enjoining Wesco and Herning from their unfair and unlawful business practices;

23   5.   Restitution and disgorgement of all profits received by Wesco or Herning as a

24   result of their unfair, unlawful and fraudulent business acts and practices in violation of California

25   Business & Professions Code § 17200, in amounts to be ascertained at trial;

26   6.   Monetary damages sustained as a result of Wesco's breaches of contract, in an

27   amount to be ascertained at trial;

28

1    7.    Monetary damages sustained as a result of Wesco's fraud, in an amount to be

2  ascertained at trial, and punitive damages in an amount sufficient to deter others similarly

3  situation from engaging in such behavior;

4    8.    Monetary damages sustained as a result of Wesco's intentional interference with

5  contractual relations, in an amount to be ascertained at trial, and punitive damages in an amount

6  sufficient to deter similar misconduct;

7    9.    Monetary damages sustained as a result of Wesco's intentional interference with

8  contractual relations, in an amount to be ascertained at trial, and punitive damages in an amount

9  sufficient to deter similar misconduct;

10    10.    Recovery of costs of suit, including reasonable attorneys' fees; and

11    11.    Such other and further relief as the Court may deem just and proper.

12

13

Dated: September 8, 2003

14

15                                            DUFFY & GUENTHER

16

17                                   By: _____
                                            Ralph P. Guenther

18                                   **DEMAND FOR JURY TRIAL**

19        Plaintiff Giacalone Electric Services, Inc. hereby demands trial by jury on all issues so

20  triable herein.

21  Dated: September 8, 2003

22

23                                            DUFFY & GUENTHER

24                                   By: _____
                                            Ralph P. Guenther
25                                            Attorneys for Plaintiff
                                            Giacalone Electric Services, Inc.
26

27

28

DOCSSF1:701629.1                          - 17 -

                                            COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# MATERIAL MANAGEMENT ALLIANCE AGREEMENT

This Material Management Alliance Agreement is made and entered into this 12 day of September, 2000, by and between KVA SUPPLY COMPANY SOUTHWEST, a California corporation ("Supplier"), and GIACALONE ELECTRICAL SERVICES, INC., a California corporation ("Purchaser");

## RECITALS:

. Supplier is in the business of purchasing for resale certain electrical equipment manufactured by others; and

2. Purchaser desires to purchase on an exclusive basis certain electrical equipment from Supplier under the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Purchase of Electrical Equipment.

During the term hereof, Purchaser agrees to purchase exclusively from Supplier and Supplier agrees to sell to Purchaser in accordance with the terms hereinafter set forth 100% of Purchaser's requirements for the following electrical equipment (the "Products"):

primary and secondary power cable, pad mount and sub surface transformers, cable accessories, connectors, secondary connectors, secondary underground boxes, slicing tapes, pulling lubricants, conduit, pad mount and other switches (S&C), underground secondary splices, fault indicators, fuses, ground rods, miscellaneous hardware and other items that may be required to fulfill the material requirements of Purchaser;

Purchaser shall provide Supplier monthly written estimates of anticipated Product requirements in order to allow Supplier to maintain adequate Product inventory levels.

2.     Term.

The initial term of this Agreement shall commence on the date first set forth above and shall continue for a period of five (5) years thereafter; provided that this Agreement shall automatically renew for two (2) successive three-year periods unless terminated by Supplier or Purchaser by providing the other with written notice at least twelve (12) months prior to the end of the initial term or either of the two extensions thereof.

1

3. <u>Purchase Price.</u>

The price and payment terms for each Product shall be established by Supplier at the time of sale; provided, however, Purchaser shall receive a fifteen percent (15%) preferred contractor discount below the lowest price charged by Supplier to other comparable purchasers who are located in the geographic area where Pacific Gas & Electric (PG&E) provides service to its customers, for sales that are made close to the time of sale of such Product to Purchaser. The Purchaser shall have the right upon request to audit Supplier's sales records for sales of the Products in the same market.

4. <u>Terms of Payment.</u>

Supplier shall invoice Purchaser on the date of shipment. All amounts due to Supplier from Purchaser shall be payable within sixty (60) days of the invoice date.

5. <u>Agreement Exclusive.</u>

This Agreement is exclusive as to Purchaser and Purchaser shall only purchase the Products from Supplier and not have the ability to contract with any third party for the purchase and sale of any Product. Notwithstanding anything herein to the contrary, Purchaser shall have the right to purchase any of the Products from any source other than Supplier during any time period in which Supplier is unable to provide and deliver said Products in a time necessary to complete Purchaser's jobs in a timely fashion, which would be determined by Purchaser's customers and other involved parties to the jobs being supplied.

6. <u>Job Site Delivery.</u>

No later than four (4) months after the date hereof, Supplier will provide job site delivery of the Products purchased by Purchaser for no additional delivery charge.

7. <u>Availability and Storage of Products.</u>

Supplier shall commit sufficient personnel and capital resources to ensure the timely and ongoing availability of the Products to Purchaser. Supplier also commits to maintain a material yard and facility that is adequate to receive, store, stage, and ship the Products.

8. <u>Warranties.</u>

(a) <u>Disclaimers:</u>

**SUPPLIER SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCES FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR ECONOMIC LOSS, BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT OR ANY OTHER LEGAL**

THEORY, EVEN IF SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR REVENUE.

Supplier makes no representation or warranty with respect to any Product sold to Purchaser pursuant to this Agreement that such Product can be sold, possessed, or used free of infringement of patent rights or other proprietary rights of others, it being understood that Supplier shall not be liable for any loss, damage or expense arising from any claims of infringement of any patent or other proprietary right arising from the use, possession, or sale of any Product.

(b)   Indemnity by Supplier for Negligence and Intentional Acts and Trademark Infringement.

Notwithstanding the foregoing, Supplier agrees as follows:

(i)   Supplier shall indemnify, defend and hold Purchaser harmless from and against any and all liability, loss, injury, damage or expense, including without limit reasonable attorneys' fees, investigative expense and cost of litigation, arising out of a claim by any third party based on the negligence or intentional act or omission of Supplier with regard to any Product purchased from Supplier hereunder.

(ii)   On demand, Supplier shall assign to Purchaser to the greatest extent possible all of its rights under any warranty, indemnification, or policy of insurance provided to it by a manufacturer, distributor, or other vendor of the Products, and shall, if necessary, cooperate with Purchaser in pursuing at Purchaser's cost, any claim thereunder, including but not limited to permitting Purchaser to prosecute a legal action in its name for their mutual benefit, as their interests may be determined.

(iii)   Supplier shall promptly fulfill, or shall promptly notify Purchaser in writing of, any notice or other requirements that must be satisfied in order to preserve any of Supplier's rights set forth in subparagraph (ii) above.

(c)   Indemnity by Purchaser for Negligence and Intentional Acts.

Purchaser shall indemnify, defend and hold Supplier harmless from and against any and all liability, loss, injury, damage or expense, including without limit reasonable attorneys' fees, investigative expense and cost of litigation, arising out of a claim by any third party based on the negligence or intentional act or omission of Purchaser with regard to any Product sold to Purchaser hereunder.

3

*Exhibit A Page 3 of Z*

9.      Representations and Warranties of Purchaser.

        Purchaser represents and warrants to Supplier, as of the date hereof and during the term of this Agreement, that:

        (a)     Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

        (b)     Purchaser has taken all necessary and appropriate corporate action with respect to the execution and delivery of this Agreement and the performance of its obligations hereunder, and this Agreement constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its terms.

        (c)     No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental or regulatory authority or agency is required in connection with the execution and delivery of this Agreement by Purchaser or its performance of the terms hereof or for the validity or enforceability thereof as to Purchaser.

        (d)     Neither execution and delivery of this Agreement by Purchaser nor performance by Purchaser of its obligations hereunder will (i) violate, conflict with or result in a breach of any provision of the Articles of Incorporation or Bylaws of Purchaser, (ii) violate, conflict with, or result in the breach of any term, condition or provision under any law or regulation applicable to Purchaser, (iii) violate, conflict with or result in a breach of any provision of, or constitute a default (or an event which, with the giving of notice, the passage of time or otherwise, would constitute a default) under, or entitle any party (with the giving of notice, the passage of time or otherwise) to terminate, accelerate or cause a default under, any agreement, indenture, or instrument binding on Purchaser, the effect of which would be material and adverse to the ability of Purchaser to perform its obligations hereunder, or (iv) violate any judgment, order, decree, stipulation, injunction or charge of any court, administrative agency or commission or other governmental or regulatory authority or instrumentality by which Purchaser is bound, the violation of which would be reasonably likely to have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement. Purchaser is not bound by any agreement, restriction or obligation, which does or would in any way interfere or be inconsistent with the obligations to be performed by Purchaser under this Agreement.

        10.     Certain Obligations and Rights of Purchaser and Supplier.

        (a)  Supplier shall be solely responsible for compliance with all applicable federal and state regulations with respect to the storage and maintenance of any Product while it is held by it for sale.

        (b)     Supplier agrees that not less often than each calendar quarter, and at any time requested by Purchaser, it shall consult with Purchaser concerning the type of Products to be offered, the manufacturers and suppliers of the Products, orders to be placed for Products, and levels of Product inventory to be maintained by Supplier.

4

11.   Termination - Obligation of Purchaser.

Upon termination of this Agreement whether upon expiration of the term or by the act of either party, Purchaser shall purchase from Supplier all Products specifically ordered by Supplier for Purchaser at Purchaser's written request.

12.   Benefit.

This Agreement shall be binding on and inure to the benefit of the parties to it and their respective heirs, legal representatives, successors and assigns.  In the event of the proposed assignment by either party of its rights and obligations hereunder, such party shall give 60 days prior written notice to the other party.

13.   Notice.

All notices, requests, demands and other communications provided for hereunder shall be in writing and shall be deemed to have been given (i) on the date of the first attempted delivery by the United States Postal Service, unless otherwise provided herein, to the respective party if mailed by certified mail, return receipt requested, to the address of the other party as set forth below, and  (ii) on the date of the first attempted delivery by a reputable overnight delivery service, to the address of the other party as set forth below or (iii) in the case of telecopier facsimile, when confirmed received by the other party.  The addresses at which notices may be sent under this Section are the following:

If To Supplier:

KVA Supply Company Southwest
Stapleton Business Center
9980 East 51st Avenue
Denver, Colorado  80238-2430
Attention: Harry Felber
Telecopy: (303) 214-8000


If to Purchaser at:

Giacalone Electrical Services, Inc.
6300 Monterey Road
Gilroy, California 95020
Attention: Vince R. Giacalone
Telecopy: (408) 847-4055

14.   Force Majeure.

5

KVA Supply Agreement.doc

Prevention or delay in the performance hereof caused by acts of God, acts of war, riot, rebellion, fire, flood, strike, lockout, lack of rail or truck transportation from regular point of shipment, shortage or unavailability of raw material, laws, regulations or requirements of any federal, state, or local government or governmental body which would make performance impossible or illegal, or any other circumstances beyond the reasonable control of either party and not resulting from the negligence or fault of such party (any such event being called "Force Majeure") shall entitle the party affected to suspend this Agreement to the extent and for so long as its performance is made impossible by such Force Majeure, by the affected party giving written notice thereof to the other party. Except for payment of sums becoming due at or prior to the event of Force Majeure, the party invoking Force Majeure will not be liable for non-performance of any obligations hereunder during continuation of such event; provided, however, that such party exercises all reasonable efforts to limit and obviate the Force Majeure, but the affected party shall not be required to settle any strike. In the event of any curtailment of Supplier's supply of a Product as a result of a Force Majeure condition, Supplier agrees that it will conduct its business in a fair and reasonable manner, and in no event will treat any other customer more favorably than it treats Purchaser. In such event Purchaser may obtain the unavailable Products from third party suppliers; provided, however, that Supplier shall have no liability whatsoever for any additional costs or expenses incurred.

15.    Modifications and Amendments.

No modification or amendment of this Agreement and no waiver of any of the Agreement's provisions or conditions shall be binding unless in writing and signed by duly authorized officers of Supplier and Purchaser.

16.    Waiver.

The waiver of any breach of or default under this Agreement by either party shall constitute a waiver only as to such particular breach or default and shall not constitute a waiver of any other breach or default. No claim or right arising out of a breach of this Agreement can be discharged in whole or in part by waiver or renunciation of a claim or right unless the waiver or renunciation is in writing and signed by an officer of the aggrieved party.

17.    Governing Law and Choice of Forum for Disputes.

This Agreement shall be construed in accordance with and governed by the laws of the state of California. If any dispute arises among the parties concerning the interpretation or performance of any portion of this Agreement, and any party brings an action against the other party seeking a declaratory order, specific performance, damages or any other legal or equitable relief based on this Agreement, the parties agree that the forum for any such action shall be a court of competent jurisdiction in the State of California, and further agree that the prevailing party in any such action, as determined by such Court, shall be awarded its reasonable attorneys' fees and costs in addition to any relief or judgment such Court awards.

6

*Exhibit A Page 6 of Z*

18. **Entire Agreement.**

       This Agreement supersedes and terminates any and all prior Agreements, if any, whether written or oral, and all communications between the parties with respect to the subject matter of this Agreement. Purchaser agrees that it has not relied on any representation, warranty or provision not explicitly stated in this Agreement; that no oral statement has been made to it that in any way tends to waive any of the terms or conditions of this Agreement; that this Agreement constitutes the final written expression of all terms of the Agreement; and it is a complete and exclusive statement of those terms. These terms and conditions shall prevail notwithstanding any additional or different terms and conditions of any purchase order or other document submitted by Purchaser.

       IN WITNESS WHEREOF, the parties have each caused this Agreement to be executed by its officers hereunto duly authorized, all as of the date first above written.

**SUPPLIER:**

KVA SUPPLY COMPANY SOUTHWEST

By: _____

Name: _____

Title: _____

**PURCHASER:**

GIACALONE ELECTRICAL SERVICES, INC.

By: _____

Name: _____

Title: _____

7

*Exhibit A Page 2 of 2*

# FIRST AMENDMENT
## TO
## MATERIAL MANAGEMENT ALLIANCE AGREEMENT

THIS FIRST AMENDMENT dated as of _____, 2001, is entered into by and between the KVA NORTHWEST DIVISION OF WESCO DISTRIBUTION, INC. (**"Supplier"**) and GIACALONE CONSTRUCTION, INC. (**"Purchaser"**).

## RECITALS:

1.     KVA Supply Company Southwest, Inc. (**"KVA"**) and Purchaser entered into a Material Management Alliance Agreement as of September 12, 2000 (the **"Material Management Agreement"**);

2.     KVA sold its electrical parts and supplies business to Supplier including all rights and benefits of the Material Management Agreement; and

3.     Purchaser and Supplier desire to enter into this First Amendment in order to provide a framework for product pricing and to avoid confusion regarding such product pricing.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

I.     <u>Amendments</u>.  The Material Management Agreement is hereby amended as follows:

1.     Paragraph 3 of the Material Management Agreement is amended and restated to read in its entirety as follows:

3.     <u>Purchase Price</u>.

(a)     <u>Exclusive Products</u>.  The purchase price of the products set forth on Exhibit A attached hereto and incorporated by reference (the **"Designated Products"**) shall initially be equal to the respective amounts set forth on Exhibit A subject to a volume discount in the initial amount of 8%.  All volume discounts shall be determined quarterly (March 31, June 30, September 30 and December 31) on the basis of purchases of Designated Products during the prior three months.  Volume discounts shall be paid by Supplier to Purchaser on or before the 45th day following the end of each calendar quarter commencing with the calendar quarter ending _____, 2001.

The purchase prices set forth on Exhibit A attached hereto are subject to change provided, however, that Supplier will make commercially reasonable efforts to provide Purchaser with a minimum of thirty (30) days prior written notice of any change in purchase price or volume discount.

*Exhibit B Page 1 of 4*

(b)   Other Products.  The purchase price of all other products under the Material Management Agreement shall be established by Supplier from time to time and shall represent Supplier's market price in the service area of Pacific Gas and Electric for the same products, at the same quantities and under similar competitive circumstances.

2.   Paragraph 11 shall be amended by deleting the reference to KVA Supply Company Southwest and substituting the following:

> KVA Northwest Division of
> WESCO Distribution, Inc.
> 7050 South Union Park Avenue
> Suite 590
> Midvale, UT  84047
> Attention: Don Rowan
> Telecopy:  (801) 233-0775

II.   Affirmation.  Except as expressly provided in this First Amendment, the other terms and conditions of the Material Management Agreement are hereby ratified, affirmed and confirmed in all respects.

WITNESS the due execution hereof as of the date first above written.

**KVA NORTHWEST DIVISION OF
WESCO DISTRIBUTION, INC.**

By:_____

Title:_____

**GIACALONE CONSTRUCTION**

By:_____

Title:_____

*Exhibit B Page 2 of 4*

-2-

| TRANSFORMER, SWITCH & CABLE PRICE LIST | | | | 4/12/01 |
|---|---|---|---|---|
| **SINGLE PHASE PAD MOUNTED TRANSFORMERS** | | | | |
| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
| 26-1501 | 95421 | 25KVA, 12/21KV, 2 BUSHING | | 1,965.00 |
| 26-1502 | 95422 | 50KVA, 12/21KV, 2 BUSHING | | 2,090.00 |
| 26-1503 | 95423 | 100KVA, 12/21KV, 2 BUSHING | | 2,583.00 |
| 26-1507 | 95424 | 25KVA, 12/21KV, 4 BUSHING | | 2,383.00 |
| 26-1508 | 95425 | 50KVA, 12/21KV, 4 BUSHING | | 2,486.00 |
| 26-1509 | 95426 | 100KVA, 12/21KV, 4 BUSHING | | 3,271.00 |
| 26-1531 | 95427 | 25KVA, 12/21KV, 6 BUSHING | | 2,508.00 |
| 26-1532 | 95428 | 50KVA, 12/21KV, 6 BUSHING | | 2,600.00 |
| 26-1533 | 95429 | 100KVA, 12/21KV, 6 BUSHING | | 3,215.00 |
| **SELLING PRICE INCLUDES *NO* SECONDARY LUGS OR INSERTS.** | | | | |
| | | | | |
| **3 PHASE DUPLEX PAD MOUNTED TRANSFORMERS** | | | | |
| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
| 26-1547 | 95434 | 25/10KVA, 12/21KV, 6 BUSHING | | 4,214.00 |
| 26-1548 | 95435 | 50/10KVA, 12/21KV, 6 BUSHING | | 4,480.00 |
| 26-1549 | 95436 | 100/25KVA, 12/21KV, 6 BUSHING | | 5,168.00 |
| 26-1550 | | 100/50KVA, 12/21KV, 6 BUSHING | | 5,583.00 |
| **SELLING PRICE INCLUDES *NO* SECONDARY LUGS OR INSERTS.** | | | | |
| | | | | |
| **3 PHASE PAD MOUNTED TRANSFORMERS, TYPE IIE** | | | | |
| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
| 26-1405 | 95432 | 75KVA, 12/21KV, 208Y/120V | | 6,211.00 |
| 26-1406 | 95430 | 150KVA, 12/21KV, 208Y/120V | | 6,979.00 |
| 26-1407 | 95431 | 300KVA, 12/21KV, 208Y/120V | | 8,510.00 |
| 26-1410 | 95489 | 75KVA, 12/21KV, 480Y/277V | | 6,259.00 |
| 26-1411 | 95419 | 150KVA, 12/21KV, 480Y/277V | | 6,917.00 |
| 26-1412 | 95417 | 300KVA, 12/21KV, 480Y/277V | | 8,303.00 |
| 26-1413 | 95420 | 750KVA, 12/21KV, 480Y/277V | | 13,844.00 |
| 26-1457 | 95433 | 300KVA, 12/21KV, 208Y/120V, W/SW | | 9,511.00 |
| 26-1460 | 95333 | 300KVA, 12/21KV, 480Y/277V, W/SW | | 9,481.00 |
| **SELLING PRICE INCLUDES *NO* SECONDARY LUGS OR INSERTS.** | | | | |
| | | | | |
| **SINGLE PHASE SUB-SURFACE TRANSFORMERS** | | | | |
| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
| 01-3881 | 95310 | 25KVA, 12/21KV, 4 BUSHING W/SW | | 3,292.00 |
| 01-3882 | 95315 | 50KVA, 12/21KV, 4 BUSHING W/SW | | 4,572.00 |
| 01-3884 | 95320 | 100KVA, 12/21KV, 4 BUSHING W/SW | | 4,686.00 |
| 02-7264 | 95467 | 25KVA, 12/21KV, 6 BUSHING W/SW | | 3,854.00 |
| 02-7265 | 95468 | 75KVA, 12/21KV, 6 BUSHING W/SW | | 5,697.00 |
| 02-7266 | 95451 | 100KVA, 12/21KV, 6 BUSHING W/SW | | 6,402.00 |
| 26-2389 | 95325 | 25KVA, 12/21KV, 4 BUSHING | | 2,463.00 |
| 26-2390 | 95330 | 37.5KVA, 12/21KV, 4 BUSHING | | 0.00 |
| 26-2391 | 95335 | 50KVA, 12/21KV, 4 BUSHING | | 2,873.00 |
| 26-2392 | 95340 | 75KVA, 12/21KV, 4 BUSHING | | 0.00 |
| **SINGLE PHASE SUB-SURFACE TRANSFORMERS - CONTINUED** | | | | |

*Exhibit B Page 3 of 4*

| 26-2393 | 95345 | 100KVA, 12/21KV, 4 BUSHING | | 4,057.00 |
| 26-0328 | 95316 | 25KVA, 12/21KV, 6 BUSHING | | 2,946.00 |
| 26-0668 | 95302 | 50KVA, 12/21KV, 6 BUSHING | | 3,409.00 |
| 26-0719 | 95300 | 75KVA, 12/21KV, 6 BUSHING | | 0.00 |
| 26-0882 | 95317 | 100KVA, 12/21KV, 6 BUSHING | | 4,547.00 |
| 26-1802 | 95318 | 150 KVA UCD, 208/120 VOLT | | 10,486.00 |
| 26-1803 | | 300 KVA UCD, 208/120 VOLT | | 12,180.00 |
| 26-1806 | 95336 | 150 KVA UCD, 480/277 VOLT | | 10,317.00 |
| 26-1807 | 95337 | 300 KVA UCD, 480/277 VOLT | | 12,251.00 |

**SELLING PRICE INCLUDES LUMBER, *NO* SECONDARY LUGS OR INSERTS.**

**ORDER 01-5623 LUMBER (EDP # 68030) FROM STOCK.**

### 3 PHASE DUPLEX SUB-SURFACE TRANSFORMERS

| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
|---|---|---|---|---|
| 26-2122 | 95326 | 25/10KVA, 12/21KV, 6 BUSHING | | 4,670.00 |
| 26-2128 | 95324 | 50/10KVA, 12/21KV, 6 BUSHING | | 4,892.00 |
| 26-2129 | 95301 | 75/15KVA, 12/21KV, 6 BUSHING | | 5,916.00 |
| 26-2130 | 95334 | 100/25KVA, 12/21KV, 6 BUSHING | | 6,444.00 |
| 26-2134 | 95329 | 75/15KVA, 12/21KV, 6 BUSHING, SW | | 6,358.00 |

**SELLING PRICE INCLUDES LUMBER, *NO* SECONDARY LUGS OR INSERTS.**

**ORDER 01-5623 LUMBER (EDP # 68030) FROM STOCK.**

### 25KV EPR CABLE

| PG&E CODE | EDP NO. | DESCRIPTION | PRICE | |
|---|---|---|---|---|
| 29-0027 | 95262 | 1/0, 260 MIL, 25KV. EPR, 1 COND. | | 1.80 |
| 29-0046 | 95263 | 1/0, 260 MIL, 25KV. EPR, 2 COND. | | 3.60 |
| 29-0047 | 95264 | 1/0, 260 MIL, 25KV. EPR, 3 COND. | | 5.40 |
| 29-0044 | 95282 | 1100MCM, 260 MIL, 25KV. EPR, 1 COND. | | 5.52 |
| 29-0045 | 95277 | 600MCM, 260 MIL, 25KV. EPR, 1 COND. | | 4.10 |

*Exhibit B Page 4 of 4*

## Critical Initiatives

### Sales Management

- A combined Growth Account/House Account program for inside salespeople will be developed. In general, there are very few accounts that are assigned to specific inside salespeople. Assignment of key, growth, and house accounts will be made by March 30. A suggested compensation plan geared to margin growth will also be included. Activities will be reviewed weekly. Performance will be reviewed monthly.

- Improve billing margin contribution of the lowest performing account reps. Currently, we have 6 account reps contributing less than $500,000 per year in billing margin. This is the minimum, acceptable level of performance.

  Sales/Branch Managers will work with these 6 individuals by assisting them with the development of sales plans, territory assignments, and regular, monthly performance reviews. The Managers will also be working toward the development of a sales potential model consistent with Heming's business. Our goal is to have potentials for all customers by the end of 2003.

- It is anticipated that several inside salespeople and several account reps will need to be replaced with higher quality individuals. To insure future growth, we plan to add two quality sales trainees to our staff. These individuals must be willing to learn our business from the ground up, and be flexible to relocate within our territory. We must grow our own future star employees now.

- Weekly review of Sales/Branch Manager sales management activities.

- Monthly review of Sales/Branch Manager sales and margin performance.

- Raise level of awareness of billing margin erosion and opportunities through monthly branch meetings. Overall Heming Northern California billing margin must exceed 24.5%.

### Grow Customer Relationships

- Each Sales/Branch Manager will be responsible for consistent, direct contact with 6 key accounts, regardless of the account rep assignment. These assignments will be made by March 30.

- Call schedules and post-call reports will be utilized for all account reps performing below the $500,000 billing margin goal. To be reviewed weekly by the Sales/Branch Manager.

*Exhibit C Page 1 of 2*

## Market Growth Initiatives

### Rule 15

Economic conditions, particularly in the first half of 2002, caused Northern California, Rule 15 sales to fall 20% from the previous year. At the same time, new competition on segments of this business caused billing margin dollars to decline 26%, during the same period. Since increased bid activity and order backlog on key commodities are up for the first 2 months of 2003, we expect an increase in volume of 10-15% for this year. But the new competition, first seen last year, will continue to have a negative impact on margins; we expect a 2-4 point loss. Because the size of this market is somewhat finite, our strategy is to do whatever is necessary to maintain our market share.

Southwest Power is currently selling Pirelli primary cable at an estimated 12% margin; we had been selling at 20%+ in most cases. The Sam/Giacalone combination has helped spread this new level across the market. While most of our customers continue to support us, we've had to lower our prices to maintain market share. No doubt, SWP is having the material shipped direct to Giacalone, by Pirelli, and then redistributing it on the truck that Vince bought for Sam. SWP is also S&C's primary distributor; they have a 10-12% price advantage. We have discussed this issue with both Okonite and S&C and have been told that the prices we currently have are the best they can do. At some point, if Sam goes away, SWP's inability to focus on the construction market to the degree that they have on the utility market will hopefully allow us to inch prices back to the levels we previously enjoyed.

Sam/Giacalone are making a real effort to promote Carte transformers. Although we currently have a cost advantage (8-12%) utilizing both Howard and Kuhlman, it is clear from consistent feed back that they are willing to sell at the 15-18% range. Again, we've attempted to leverage our relationship with both of our suppliers to gain an adjusted price level. We need to be extremely careful with this approach. If either supplier feels we are working with the other, or if they find that Carte's prices are at a level higher than theirs, we could end up losing.

AZCO is a $15-18MM/ year distributor of PVC and boxes. Since the decline of the telecom market, they have begun to pursue our Rule 15 customers more aggressively. They operate a low overhead model, and have shown their willingness to sell their products from stock below 10% margin, in order to gain market share. Our material costs are essentially the same as theirs. This will be a constant battle, centering on buying these basic commodities at the right price.

In light of the above, several tactics need to be employed in order to maintain our market share.

Exhibit C Page 2 of 9

- Terminate the current Giacalone agreement at the earliest possible date. The sooner this happens, the better chance we have to implement a new agreement that limits their options.

- Maintain supplier relations that will allow us to maintain our current exclusivity, and price advantages.

- Develop even closer relations with our customers. This will allow us to get the last look at competitive prices, and improve our chances of getting plus dollars for our services. In most cases, we are already successful, but we cannot take anything for granted.

- Maintain consistent contact with independent Utility Design Consultants.

- Maintain consistent contact with larger Municipal Utilities (SMUD & MID) as they investigate the utilization of contractors to perform line extension work.

- Eliminate competition by consistently delivering superior service, and meeting legitimate price levels.

- Gradually increase margins on products that we maintain exclusivity.

- Control operating costs and investment management.

In the Southern California market, Rule 15 activity increased over 60% in 2002, over the previous year. Margins continue to average 20%. This substantial growth can be attributed to the overall size of the Southern California housing market, and SCE's ability to do the work. We feel that while we are seeing 60-70% of the new residential construction market in Northern California, our participation in the south, at the end of 2001, was probably 10%.

The major issues in Southern California are:

1. SCE will currently not allow distributors to sell distribution transformers.

2. So Cal Gas is aggressively trying to keep contractors from doing the work.

3. SDG&E will not allow distributors to provide any products beyond PVC and boxes.

4. There are currently 2 contractors that focus on the Rule 15 market, and 2 others that dabble in it. There are 30 contractors in Northern California, serving a much smaller market.

5. SCE has recently changed their cable spec, and have opened the Rule 15 market (only) to both Pirelli and BICC. Both are being represented by SWP.

*Exhibit C Page 3 of 2*

Obviously, our strategy is to help grow a profitable market.

- Continue work with the Utilities to allow us to handle the full electric and gas material package.

- Quietly attract new contractors to this emerging market. Current customers would be outraged if they felt we were helping to increase their competition.

- Southwire continues to be SCE,s exclusive source. We are working with their local utility rep to devise a strategy to deal with the new cable suppliers and SWP. This will be an ongoing process.

- A top quality, full time Sales Manager is an absolute necessity in Southern California.

Overall, our long term goal is to develop a Herning/Wesco joint venture that will allow us to furnish and deliver the majority (if not all) of the Utilities material requirements. Although Kelly Shaw facilitated an initial meeting between Herning, Allied and Wesco personnel, not much has happened. This process needs to be re-energized in order for us to succeed. The possibilities are too great to ignore.

## Lighting

Our lighting activity has been primarily focused on the residential Rule 15 market. The worsening condition of the commercial construction market has caused a number of distributors not previously involved in our market to begin quoting prices to our customers at levels far below our target margins. In addition, while many of our Rule 15 contractors had been able to "negotiate" much of their work in the past, most are now finding stiff competition on many of their bids. Although the services that Herning provides continue to be important to our customers, increased competition has caused our customers to consider price as a major factor. Sales in 2002 topped out at $4 million with a 16.9 % billing margin compared to $6.3 million in sales with an 18.2% billing margin in year 2001. The upside being, that the first two months in year 2003 have seen increased bid activity, which translates to sales of $1.1 million with a 15.6% billing margin versus $500,000 in sales with a 17.5% billing margin during the same period of 2002. We also have $1.1 million in backlog with 14.6% billing margin dollars. If conditions continue to be favorable, we should see about a 10 –12 percent increase in sales for the year 2003, with billing margins falling 1-2%.

We continue to look for new opportunities to increase lighting products sales. Concentrating on the roadway contractors, Tennyson Electric, Mike Brown Electric, W. Bradley Electric, Rosendin Electric, Columbia Electric, St. Francis Electric, Steiny Electric, we feel we can gain market share in the metered pedestal market along with the Caltrans market. We will also more aggressively pursue cities and counties who maintain



*Exhibit C Page 4 of 9*

their own lighting systems. Target products will be luminaries, lamps, photo cells and poles.

Here is a recap of our mission:

- Move margins up 10% on stock galvanized replacement pole parts to contractors who need the product, but didn't purchase the original order from Heming.

- Team up with Pacific Utility Products to gain market share on metered pedestals. Goal is to sell 100 pedestals at an average of $1200.00 at 15% billing margin.

- Increase awareness with existing customer base about available inventory and delivery capabilities on galvanized poles and luminaries and lamps.

- Identify and target Cities and Counties to sell HID lamps, luminaries and poles. Goal is $25,000 of new business.

- Work closely with American Electric and Valmont to provide a competitive, complete material package for the Department Of Transportation market. Goal is $100,000 of new business.

- Leverage supplier relationship with Valmont Industries for an advantage on galvanized poles. Goal is to increase billing margin dollars 2%.

- Develop supplier partners in the THHN and THW street lighting wire market. Goal is $50,000 of new business.

Overall, we have a solid lighting package and exceptional services and need to grow business in new market segments for the upcoming years. Wesco's partnership with Bussman, Philips, and other related manufacturers along with Heming's partnership with Valmont and American Electric will enable us to improve performance in future years.

## Substructure

Several growth opportunities that we have enjoyed over the last few years have dissolved in 2002. Among them, the Telecommunications boom is gone. In addition, the downward spiral of the stock market, national, state and municipal deficits have all contributed to a decrease in infrastructure construction. What does this mean for Heming Underground's business? Our traditional product line of substructure material (electric, telecom and gas), accounts for nearly 50% of our annual sales, dropped 12% in 2002. The substructure market activity typically has a slow during the first quarter due to traditional wet weather. 2003 has erased that theory due to resin shortages and increases petroleum products. We expect an increase in sales of 10% for this year. Some from

Exhibit C Page 5 of 2

increases in material prices and some from regaining lost market share. Although, we will be selling more product the margins will slide due to more competition.

Azco is a distributor, located in the Central Valley/ Stockton between Livermore and Sacramento. Since the early 90's they have been a competitor of the Sacramento market and have recently moved into the Bay Area regions. They inventory in bulk and sell at low margins. Since they are located in Stockton they have low overhead and also, have their own fabrication facility (Smith Plastics) that manufactures bends. SP has two locations: Stockton and Mexico. I feel the majority of bends come from Mexico due to extremely low wages and overhead. Azco, parallels us when it comes to service with the tractor/trailer and piggyback forklift. They also carry the full line of substructure material: pipe/boxes/gas/etc.

Electrical Wholesalers such as, Rexel, Graybar, CED, etc. will always be there but cannot beat our service and product knowledge. They look at the market as "spill over business" in which they direct ship to the site at 2-5% margins.

Here are some thoughts and ideas to grow our market share.

Suppliers:

- Identify and purchase from manufactures and representatives who will protect and support Herning in the market.

- Pricing. With rapidly increasing market levels, we need to be staying ahead of price increases by buying at the right time.

- Updates on market trends.

- Product information and training.

- Proactive sales force pushing for approval of new products in Utility/Municipal markets. (Polymer Vaults waiting for approval w/PG&E)

- Support in competitive situations.

Herning:

- Make sure price, availability and delivery meet the requirements of the customer.

- Centralize purchase on a Region basis.

- Share pricing and inventory information between Branches.

Exhibit C Page 6 of 2

- 30 minute conference call, weekly with Managers and Sales Team re: market trends, pricing, general information.

- Focus on advantages: Gas Market Perfection /Gas Risers/Tools.

- Focus on Service not just on Price.

Since substructure products represent the significant portion of our overall business, we need to get back to basics; service and an aggressive sales effort with all of our customers. Our Sales Management process will be key to our success.

## Cost Containment

### Operating Expenses

A detailed Operating Expense review has been made during the budgeting and planning process that focuses on balancing our deployed costs within the current action plans and business climate:

- Heming corporate offices have been closed and relocated to our Hayward facility. Financial Services personnel also relocated. Eight corporate employees and one temporary reduced from payroll at a payroll savings of over 1.1 million dollars. Rent and occupancy charge savings of 50k per year can also be realized.
- Corporate direct support services are expected to wipe out over 701k of this savings annually.
- PPM Goal of less than 45% percent has been established.
- Transportation as a percent of sales of less than 2.3% has been established.
- Management Incentive plans focusing on Sales Growth and EBIT growth are being developed to help maintain cost efficiency.
- Merit Increases have been consistently held to less than 4% of total base payroll.
- No branch Facility expansions or relocations are scheduled in 2003.

### Inactive Inventory

- 2003 Exposure is 1,806K.
- All Branches developing and working a Inactive Inventory plan.
- Inventory adjustment objective of .5% of sales set.
- % Inactive Inventory greater than 6 months set at less than 10%.
- Fiber and Quad lists developed in Tele-com sales to give national exposure.
- Branch Transfers underway to send slow moving stock to branches that sell.
- Inventory turn objective is 6 to 8 in most branches.

Exhibit C Page 7 of 9

## Working Capital

### Inventory

- Reduce Inventory to 60 days supply.
- Purchase more accurately, within core business.
- Maintain limits of authority on purchases.
- Work an Inactive Inventory plan in every branch.
- Utilize national tele-com department for fiber and quad items.

### Accounts Receivable

- Reduce Accounts Receivable to less than 60 days.
- Train personnel on use of Endura.
- Meet with customers to explain terms of sale.
- Streamline the Job Account process to ensure secured position job accounts.
- Resolve consolidation/bridge code issue within cash applications.
- Goal to clear all claims and deductions within 30 days.

### Accounts Payable

- Review top 20 suppliers to identify opportunities by supplier. Send in supplier number change where applicable.
- Review large orders with rep to request extended dating terms by Purchase Order.
- Train A/P personnel on available extended dating techniques.
- Set zero objective on 224-15 variances.
- Same day 222 and 224 offsetting entries on adjustments.

*Exhibit C Page 8 of 9*

# 2003 Business Plan

## 1. Herning Northern California Group Objectives
(Includes 7820, 7821, 7822, 7823, 7825, 7826)

| Description | 2002 | 2003 Objective | Target 12/03 |
|---|---|---|---|
| EBIT | 4.7% | 8.0% | +3.3% |
| Gross Margin | 24.3% | 24.5% | +0.2% |
| Sales Growth | $43078 | $43950 | +2.0% |
| Operating Costs | 18.8% | 16.5% | -2.3% |
| Inventory | 79 Days | 60 Days | -19 Days |
| A/R | 70 Days | 60 Days | -10 Days |
| Inactive Inventory | 10.4% | 4% | -6.4% |

## 2. Critical Initiatives

| Sales Management | | |
|---|---|---|
| Training Inside & Outside | Watch List/Reviews | Margin Improvement |

| Grow Customer Relationships | | |
|---|---|---|
| Key Accounts | Call Schedules | Call Reports |

| Market Growth Initiatives | | |
|---|---|---|
| Rule 15 | Substructure | Lighting |

| Cost Containment | |
|---|---|
| Operating Expenses | Inactive Inventory |

| Working Capital | | |
|---|---|---|
| Inventory | Accounts Receivable | Accounts Payable |

*Exhibit C Page 2 of 2*